**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MATTHEW LEVY and ANTHONY
RONDOLETTO, on behalf of themselves
and all others similarly situated,

                    Plaintiffs,

    vs.

WESTFIELD BANK,

                  Defendant.

Civil Action No. _____

**<u>JURY TRIAL DEMAND</u>**

**<u>CLASS ACTION COMPLAINT</u>**

      Plaintiffs Matthew Levy and Anthony Rondoletto, on behalf of themselves and all others similarly situated, bring this class action complaint against Defendant Westfield Bank, and allege the following:

**<u>INTRODUCTION</u>**

      1.     Plaintiffs bring this action individually and on behalf of all similarly situated consumers against Defendant Westfield Bank ("Westfield Bank" or "Bank" or "Defendant"), arising from its routine practices of a) assessing an overdraft fee ("OD Fee") on transactions that do not actually overdraw checking accounts; and b) assessing more than one insufficient funds fee ("NSF Fee") on the same transaction.

      2.     Westfield Bank's customers have been injured by the Bank's improper practices to the tune of millions of dollars bilked from their accounts in violation of Westfield Bank's clear contractual commitments.

      3.     Plaintiffs, on behalf of themselves and a Class of similarly situated consumers, seek to end Westfield Bank's abusive and predatory practice and force it to refund the improper charges.

Plaintiffs assert claims for breach of contract, including breach of the covenant of good faith and fair dealing, for violations of the Massachusetts Consumer Protection Act, G.L. c. 93A, and seek damages, restitution, and injunctive relief, as set forth more fully below.

4.      While there is nothing unlawful about assessing NSF Fees on accounts when such fees are assessed in compliance with contractual terms, NSF Fees in general have a crushing impact on persons living paycheck to paycheck. This is why the financial services industry is increasingly moving away from such fees.

5.      For example, one of the nation's largest consumer banks, Ally Bank recently stopped assessing overdraft fees altogether. Diane Morais, Ally Bank's president of consumer and commercial banking, said that one reason is because NSF Fees disproportionately affect people who are living paycheck to paycheck. *Overdraft Fees Are Getting the Boot at Ally Financial*, The Wall Street Journal (June 2, 2021), https://www.wsj.com/articles/overdraft-fees-are-getting-the-boot-at-ally-financial-11622631600.

## PARTIES

6.      Plaintiff Matthew Levy is a citizen and resident of Springfield, Massachusetts.

7.      Plaintiff Anthony Rondoletto is a citizen and resident of Springfield, Massachusetts.

8.      Defendant Westfield Bank is engaged in the business of providing retail banking services to consumers, including Plaintiffs and members of the putative class. Westfield Bank has $2.1 billion in assets, is headquartered in Southwick, Massachusetts, and maintains branch locations across Massachusetts and Connecticut.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed class is comprised of at least 100 members; (2) at least one member of the proposed class resides outside of Massachusetts; and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Westfield Bank is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### I.   WESTFIELD BANK CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW CHECKING ACCOUNTS

11.     Plaintiff Levy has a checking account with Westfield Bank.

12.     Westfield Bank issues debit cards to its checking account customers, including Plaintiff Levy, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals, and other electronic debit transactions.

13.     Pursuant to its Account Documents, Westfield Bank charges fees for transactions that purportedly result in an overdraft.

14.     Plaintiff Levy brings this cause of action challenging Westfield Bank's practice of charging OD Fees on "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

15.     Here's how it works: when a debit card transaction is authorized on an account with positive funds to cover the transaction, Westfield Bank immediately reduces accountholders'

checking accounts by the amount of the purchase, setting aside funds from the checking account to cover the transaction, and as a result, the accountholders' "available balance" reflects that subtracted amount. Westfield holds these funds from the time the transaction is authorized until it settles. Therefore, customers' accounts will always have sufficient available funds to cover these transactions when they settle because Westfield Bank has already sequestered these funds for payment.

16.     However, despite putting a hold on sufficient available funds for debit card and other POS transactions at the time those transactions are authorized, Westfield Bank later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

17.     Westfield Bank maintains a running account balance tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions when they are made. When a customer makes a purchase with a debit card, Westfield Bank sequesters the funds needed to pay for that transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically held for when the given debit card transaction settles.

18.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means subsequent transactions may incur OD Fees due to the unavailability of the funds sequestered for earlier debit card transactions which have been authorized but have not yet settled.

19.    Still, despite keeping those sequestered funds off-limits for other transactions, Westfield Bank improperly charges OD Fees on those APPSN Transactions, even though the APPSN Transactions **always** have sufficient available funds to be covered.

20.    Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

21.    There is no justification for these practices, other than to maximize Westfield Bank's OD Fee revenue. APPSN Transactions only exist because intervening checking account

transactions reduce an account's balance between the time that APPSN Transactions are authorized and when they settle. Westfield Bank is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Westfield Bank was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

22.     Besides being unfair and unjust, these practices breach contractual promises made in Westfield Bank's adhesion contracts—contracts which fail to inform accountholders about the true nature of Westfield Bank's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

23.     In short, Westfield Bank is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

     *A.    Mechanics of a Debit Card Transaction*

24.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Westfield Bank. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Westfield Bank, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

25.     At this step, if the transaction is approved, Westfield Bank immediately reduces the funds from the accountholder's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

26.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed

in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending

Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on
> funds in the consumer's account to ensure that the consumer has sufficient funds in
> the account when the transaction is presented for settlement. This is commonly
> referred to as a "debit hold." During the time the debit hold remains in place, which
> may be up to three days after authorization, those funds may be unavailable for the
> consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration,

Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

27. Sometime thereafter, the funds are actually transferred from the customer's account

to the merchant's account.

28. Westfield Bank (like all banks and credit unions) decides whether to "pay" debit

card transactions at authorization. After that, Westfield Bank is obligated to pay the transaction no

matter what. For debit card transactions, that moment of decision can only occur at the point of

sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—

when Westfield Bank may choose to either pay the transaction or decline it. When the time comes

to actually settle the transaction, it is too late—the financial institution has no discretion and must

pay the charge. This "must pay" rule applies industry wide and requires that, once a financial

institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a

demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-

01, 59046 (Nov. 17, 2009).

29. There is no change—no impact whatsoever—to the available funds in an account

when this step occurs.

### B.     Westfield Bank's Account Contract

30.     Plaintiff Levy has a checking account with Westfield Bank, which is governed by Westfield Bank's standardized Account Documents, attached hereto as Exhibit A and B.

31.     The Account Documents indicate that Westfield Bank will only pay overdrafts when an accountholder lacks sufficient funds to pay for a transaction, reserving discretion for whether to pay an overdraft:

> **Overdrafts** - You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying, or not paying, discretionary overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts. For consumer accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions if you have not opted-in to that service. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

Ex. A, pp. 4-5.

32.     The Overdraft Opt-In form makes the same promise:

> An **overdraft** occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdrafts in two different ways:
> - We have **standard overdraft practices** that come with eligible accounts.
> - We offer **overdraft protection plans**, such as a link to a savings account (Savings Overdraft Protection) or Westfield Bank's Personal Line of Credit, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.
>
> **What are the standard overdraft practices that come with my account?**
> We **DO** authorize and pay overdrafts for the following types of transactions:
> - Checks and other transactions made using your checking account number
> - Automatic bill payments
>
> We **DO NOT** authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):

- ATM transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we **do not guarantee** that we will always authorize and pay any type of transaction. If we **do not** authorize and pay an overdraft, your transaction will be declined.

**What fees will I be charged if Westfield Bank pays my overdraft?**
Under our standard overdraft practices:
- We will charge you a fee of $30 each time we pay an overdraft
- We limit your daily overdraft charges to $150

Ex. B, p. 1.

33.    The above promises mean that transactions are only overdraft transactions when they are authorized into a negative account balance.

34.    In other words, a transaction that is authorized on a positive balance should not incur an overdraft fee because there is enough money in the account to cover the transaction. More specifically, when Westfield authorizes the transaction on a positive balance, it places a hold on the funds needed for the transaction, making those funds unavailable for use in later transactions. It follows that those same funds are then used to settle or pay the transaction.

35.    However, Westfield's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

36.    More specifically, at the moment a debit card transaction is getting ready to settle, Westfield Bank does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, Westfield Bank releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

37.    This secret step allows Westfield Bank to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which Westfield Bank specifically set aside money to pay them.

38.    This is a breach of Westfield's Account Documents.

39.    First, the Account Documents never disclose that Westfield will charge customers OD fees on transactions approved into a positive balance. Second, Westfield does not disclose, contrary to reasonable expectation, that Westfield does not use the hold placed on funds to pay the transactions. Nor do the Account Documents disclose Westfield's internal policy allowing them to manipulate the settlement process to justify an OD Fee.

40.    This discrepancy between Westfield Bank's actual practices and the contract causes accountholders to incur more OD Fees than they should.

41.    In sum, there is a huge gap between Westfield Bank's practices as described in the Account Documents and Westfield Bank's practices in reality.

### C.    *Westfield Bank's Abuses Contractual Discretion*

42.    Westfield Bank's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the Account Documents. In addition, Westfield Bank exploits its contractual discretion to the detriment of accountholders when it uses these policies.

43.    Westfield reserves discretion to pay overdrafts and to assess an OD Fee when it pays an overdraft. That discretion extends to Westfield's decision as to whether to pay an overdraft at the time that Westfield is asked to authorize a transaction.

44.    Westfield's discretion to approve overdrafts does not extend to imposing OD Fees on transactions that never overdrew an account in the first place. Westfield thus abuses its contractual discretion by approving debit transactions made on a positive balance, driving down

the account balance, and then momentarily depositing and withdrawing the requested funds to falsely claim that the account had an insufficient balance for the original transaction.

45.    Westfield Bank uses this contractual discretion unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

### D.    *Reasonable Accountholders Understand Debit Card/POS Transactions Are Debited Immediately*

46.    The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with an accountholder's reasonable expectation that they will only be charged OD Fees on transactions authorized into a negative balance. When an accountholder initiates what later becomes an APPSN Transaction, their available balance displayed on an app, website, or ATM tells them that they have sufficient available funds for the transaction. Accountholders know that a transaction will place a hold on those funds and reduce their available balance rendering those funds unavailable. They expect that those same funds will be applied to settle the debit card transactions for which they are debited. Otherwise, there would be no purpose of the immediate debit and hold for transactions.

47.    Westfield Bank was and is aware that this is precisely how accountholders reasonably understand such transactions to work.

48.    Defendant knows that many accountholders use debit cards as a budgeting device because they prevent the accountholder from running up debts and because the money comes directly out of a checking account so that the accountholder cannot spend money that they do not have.

49.    Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is

immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, Consumer Action (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last visited June 4, 2021).

50.    Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, Consumer Action, http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited June 4, 2021).

51.    This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States increased by approximately 1.4 million in a recent five-year period and, with that increasing ubiquity, consumers have viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/morepeople-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

52.    Not only have accountholders increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

53.     Westfield Bank was aware of accountholder perception that debit transactions reduce an account's available balance *in a specified order*—namely, the moment they are initiated—and its account agreement only supports this perception.

### E.     Plaintiff Levy's Experience

54.     As an example, on June 5, 2019, Plaintiff Levy was assessed an OD Fee for a debit card transaction that settled that day, despite the fact that positive funds were previously sequestered, prior to that day, for the transaction on which Plaintiff Levy was assessed the OD Fee. At the time that the positive funds were sequestered, Plaintiff Levy had a positive balance, which would not have caused an OD Fee.

## II.     WESTFIELD BANK CHARGES MORE THAN ONE FEE ON THE SAME TRANSACTION

55.     Westfield Bank's Account Documents allow Westfield Bank to charge a *single* $30 NSF Fee when a transaction is returned for insufficient funds or paid despite insufficient funds.

56.     Westfield Bank breaches its Account Documents by charging more than one $30 NSF Fee on the same transaction, since the contract explicitly states—and reasonable consumers understand—that the same transaction can only incur a single NSF Fee.

57.     A recent Washington Post article discussed predatory overdraft fees, labeling NSF fees like those Westfield Bank imposes as "indefensible" because "the customer gets hit with multiple charges for the same item." *I bought my kids dinner – and saw firsthand how overdraft fees punish the poor,* The Washington Post (October 1, 2021), https://www.washingtonpost.com/outlook/i-bought-my-kids-dinner--and-saw-firsthand-how-overdraft-fees-punish-the-poor/2021/09/30/32383c40-216e-11ec-b3d6-8cdebe60d3e2_story.html. The banks "are charging a fee for doing literally nothing.... [T]his is

like asking a friend if I can borrow $20, only to have him take $10 out of my wallet for turning down my request." *Id.*

58.     Westfield Bank's abusive practices are not standard within the financial services industry. Indeed, major banks like Wells Fargo—one of the largest consumer banks in the country—charge one NSF Fee per item, even if that item is resubmitted for payment multiple times. And while some other banks engage in the same practices as Westfield Bank, their members agree to terms authorizing the fee practice.

59.     Until June of 2020, Westfield Bank's Account Documents did not say that Westfield Bank may repeatedly charge customers multiple fees on a single transaction. To the contrary, the Account Documents indicated Westfield Bank will only charge a single NSF Fee on a transaction.

**A.     Plaintiff Rondoletto's Experiences.**

60.     In support of his claim, Plaintiff Rondoletto offers examples of fees that should not have been assessed against his checking account. As alleged below, Westfield Bank: (a) reprocessed previously declined transactions; and (b) charged an additional fee upon reprocessing.

61.     For example, on June 2, 2018, Plaintiff Rondoletto was charged $30 NSF Fees on transactions that were resubmitted by the merchant for payment without Plaintiff Rondoletto's request to reprocess the transactions.

62.     Each merchant request for payment was for a single transaction and, as is laid out in Westfield Bank's Account Documents, should be subject to, at most, a single NSF Fee (if Westfield Bank returned it or paid it).

**B.    The Imposition of Multiple Fees on a Single Transaction Violates Westfield Bank's Express Promises and Representations.**

63.    Westfield's Account Documents provide the general terms of Plaintiff Rondoletto's relationship with Westfield Bank and therein makes explicit promises and representations regarding how transactions will be processed, as well as when NSF Fees may be assessed.

64.    Westfield Bank's Account Documents state that the Bank will assess a single fee of $30 for a transaction that is returned due to insufficient funds.

65.    According to Westfield Bank's Account Documents:

Overdraft Fees

| | |
|---|---|
| **Insufficient Funds Charge**<br>(per item paid or returned, daily maximum fee of $150) | **$30** |
| **Uncollected Funds Charge**<br>(per item paid or returned) | **$30** |

*An overdraft may be created by check, in person withdrawal, ATM withdrawal, or other electronic means.*

Ex. C.

66.    The same check, ACH, or other electronic payment on an account is not a new "item" each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff Rondoletto took no action to resubmit the transaction.

67.    Even if Westfield Bank reprocesses an instruction for payment, it is still the same item. The Bank's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

68.    As alleged herein, Plaintiff Rondoletto took only a single action to make a single payment; he therefore created only one transaction and may be charged only a single fee.

69.    As the disclosures described above show, Plaintiff Rondoletto never agreed that Westfield Bank may assess multiple NSF Fees for a transaction that was returned for insufficient funds and later reprocessed one or more times and returned again.

70.    For the first time ever, in June of 2020, Westfield Bank changed its Account Documents to disclose its practice of charging multiple fees on the same transaction.

71.    In sum, Westfield Bank promises that one $30 NSF Fee will be assessed per item, and this must mean all iterations of the same instruction for payment. As such, Westfield Bank breached the contract when it charged more than one fee per transaction.

72.    A reasonable consumer would understand that Westfield Bank's Account Documents permit it to assess an NSF Fee only once per "item."

73.    Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "item," which the Bank will either pay (resulting in an overdraft item) or return (resulting in a returned transaction) when it decides there are insufficient funds in the account. Nowhere do Westfield Bank and its customers agree that Westfield Bank will treat each reprocessing of a check or ACH payment as a separate transaction, subject to additional fees.

74.    Customers reasonably understand, based on the language of the Account Documents, that the Bank's attempts to reprocess checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger additional NSF Fees. In other words, it is always the same transaction.

75.    Banks like Westfield Bank that employ this abusive multiple fee practice know how to plainly and clearly disclose it. Indeed, other banks and credit unions that engage in this abusive

practice require their accountholders to expressly authorize it—something Westfield Bank never did until June of 2020.

76.    For example, First Hawaiian Bank engages in the same abusive practices as Westfield Bank, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

*Terms and Conditions of FHB Online Services*, First Hawaiian Bank 40, https://bit.ly/2KWMvTg (last accessed Jan. 28, 2021) (emphasis added).

77.    Klein Bank similarly states in its online banking agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.**

*Consumer Account Terms and Conditions*, Klein Bank 4 (Jan. 2013), https://bit.ly/2KVCkhI (emphasis added).

78.    Central Pacific Bank, a leading bank in Hawai'i, states in its deposit account under the "MULTIPLE NSF FEES" subsection:

> Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient funds ("NSF") in your account, may be resubmitted one or more times for payment, and a returned item/transaction fee will be imposed on you each time an item and

transaction resubmitted for payment is returned due to insufficient/non-sufficient funds.

*Miscellaneous      Fee      Schedule*,    Central    Pacific    Bank    1    (Jan.    4.    2021), https://www.cpb.bank/media/2776/fee-001.pdf (last accessed June 4, 2021).

79.     BP Credit Union likewise states: "We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item." *Membership and Account Agreement,* BP Federal Credit Union, ¶ 14(a), https://www.bpfcu.org/images/docs/membership-agreement.pdf (last accessed June 4, 2021).

80.     Regions Bank likewise states:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item.

*Deposit Agreement*, Regions Bank 18 (2018), https://bit.ly/2L0vx6A (last accessed June 4, 2021).

81.     Andrews Federal Credit Union states:

You understand and agree that a merchant or other entity may make multiple attempts to resubmit a returned item for payment. Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to use for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

*Terms & Conditions*, Andrews Federal Credit Union 17 (Aug. 2020), ¶ 6, https://bit.ly/3iXEdHb (last accessed June 4, 2021).

82.     Consumers Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Member Services Guide*, Consumers Credit Union 5 (Apr. 2020), ¶ 11a, https://bit.ly/3iVM1ta

(last accessed June 4, 2021).

83.     Wright Patt Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and represented regardless of the number of times an item is presented or represented to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Important Account Information*, Wright Patt Credit Union 13 (July 2020), ¶ 6.1, (last accessed

June 4, 2021).

84.     Railroad & Industrial Federal Credit Union states:

Consequently, because we may charge an NSF fee for an NSF item each time it is presented, we may charge you more than one NSF fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Important Account Information for Our Members*, Railroad & Industrial Federal Credit Union, p.

2, (Aug. 1, 2019), https://bit.ly/3t5ehhF (last accessed June 4, 2021).

85.     Partners 1st Federal Credit Union states:

Consequently, because we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Consumer Membership & Account Agreement*, Partners 1st Federal Credit Union, p. 11 (Sept. 15, 2019), https://bit.ly/39pDZWb (last accessed March 2, 2021).

86.    Members First Credit Union states:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once** . . . we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representation[.]

*Membership and Account Agreement*, Members First Credit Union of Florida 3, https://bit.ly/39rRJ2Y (last accessed March 2, 2021).

87.    Community Bank, N.A. states:

We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.

*Overdraft and Unavailable Funds Practices Disclosure*, Community Bank 5 (Nov. 12, 2019), https://bit.ly/3iY9dH2 (last accessed June 4, 2021).

88.    RBC Bank states:

We may also charge against the Account an NSF fee for each item returned or rejected, including for multiple returns or rejections of the same item.

*Service Agreement for Personal Accounts*, RBC Bank 13 (Sept. 17, 2014), https://bit.ly/3otUtko (last accessed June 4, 2021).

89.    Diamond Lakes Credit Union states,

Your account may be subject to a fee for each item regardless of whether we pay or return the item. We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item.

*Membership and Account Agreement*, Diamond Lakes Federal Credit Union, https://bit.ly/39o2P94 (last accessed June 4, 2021).

90.    Parkside Credit Union states,

> If the Credit Union returns the item, you will be assessed an NSF Fee. Note that the Credit Union has no control over how many times an intended payee may resubmit the same check or other item to us for payment. In the event the same check or other item is presented for payment on more than one occasion, your account will be subject to an additional charge on each occasion that the item is presented for payment. There is no limit to the total fees the Credit Union may charge you for overdrawing your account.

*Membership and Account Agreement*, Parkside Credit Union 21 (Jan. 30, 2020), https://bit.ly/3aaXfpG (last accessed March 2, 2021).

91.    Westfield Bank provides no such disclosure, and by not doing so, deceives its accountholders.

### C.    The Imposition of Multiple Fees on a Single Transaction Breaches Westfield Bank's Duty of Good Faith and Fair Dealing.

92.    Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are vested with a discretionary power over the other party. Further, as to bank transactions, the Uniform Commercial Code ("UCC")—which has been adopted by all states—mandates good faith and fair dealing. As such, when a party such as Westfield Bank gives itself discretion to act, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that the Bank is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the Bank has a duty to honor transaction requests in a way that is fair to Plaintiff Rondoletto and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties.

93.     Here—in the adhesion agreements Westfield Bank foisted on Plaintiff Rondoletto and its other customers—Westfield Bank has provided itself numerous discretionary powers affecting customers' bank accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, the Bank abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged multiple fees for the same transaction.

94.     Westfield Bank exercises its discretion in its own favor—and to the prejudice of Plaintiff Rondoletto and its other customers—when it defines "item" in a way that directly leads to more NSF Fees. Further, Westfield Bank abuses the power it has over customers and their bank accounts and acts contrary to their reasonable expectations under the Account Documents. This is a breach of the Bank's implied covenant to engage in fair dealing and act in good faith.

95.     By exercising its discretion in its own favor—and to the prejudice of Plaintiff Rondoletto and other customers—by charging more than one fee on a single transaction, Westfield Bank breaches the reasonable expectation of Plaintiff Rondoletto and other customers and in doing so violates the implied covenant to act in good faith.

96.     It was bad faith and totally outside Plaintiff Rondoletto's reasonable expectations for Westfield Bank to use its discretion to assess multiple NSF Fees for a single attempted payment.

## CLASS ACTION ALLEGATIONS

97.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. The proposed classes are defined as:

> All United States citizens who, within the applicable statute of limitations preceding the filing of this lawsuit, were holders of a Westfield checking account and were charged OD Fees on transactions that were authorized into a positive available balance (the "APPSN Class") (Proposed Class Representative: Levy).

All United States citizens who, within the applicable statute of limitations preceding the filing of this lawsuit, were Westfield Bank checking account holders and were charged multiple fees on the same item (the "Retry Class") (Proposed Class Representative: Rondoletto).

98.     Excluded from the Classes are Defendant, Defendant's subsidiaries and affiliates, their officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, all customers who make a timely election to be excluded; governmental entities; and all judges assigned to hear any aspect of this litigation, their immediate family members, and chambers staff. Also specifically excluded are any individuals who were not United States citizens at the time this action was commenced.

99.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class and/or to add a subclass(es), if necessary, before this Court determines whether certification is appropriate.

100.     Plaintiffs readily satisfy the requirements set forth in Federal Rule of Civil Procedure Rule 23(a) and (b).

101.     <u>Numerosity</u>: The parties are numerous such that joinder is impracticable. Given the nature of the banking industry, and subject to class discovery, the Class consists of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to Westfield Bank's records. Westfield Bank has the administrative capability through its computer systems and other records to identify all members of the Class, and such specific information is not otherwise available to Plaintiffs.

102.     <u>Commonality</u>: The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Class. Such common

legal or factual questions include, but are not limited to:

a) Whether Westfield Bank charged OD Fees on transactions when those transactions did not overdraw accounts;

b) Whether Westfield Bank charged multiple fees on a single transaction;

c) Whether the conduct enumerated above violates the contract;

d) Whether the conduct enumerated above violates the covenant of good faith and fair dealing;

e) Whether Westfield Bank engaged in unfair and deceptive acts and practices relating to the imposition of OD Fees and NSF fees, in violation of G.L. c. 93A, §§ 2 and 9 and,

f) The appropriate measure of damages.

103. <u>Typicality:</u> Plaintiffs' claims are typical of the claims of the other members of the Class in that they arise out of the same wrongful business practices by Westfield Bank, as described herein.

104. <u>Adequacy:</u> Plaintiffs are more than adequate representative of the Class in that Plaintiffs are Westfield Bank checking accountholders and have suffered damages as a result of Westfield Bank's contract violations. In addition:

a) Plaintiffs are committed to the vigorous prosecution of this action on behalf of themselves and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of accountholders against financial institutions;

b) There is no conflict of interest between Plaintiffs and the unnamed members of the Class;

c) Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

d) Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

105. <u>Predominance</u>: Common questions predominate over questions that may affect only individual class members because Westfield Bank has acted on grounds generally applicable to the class. In other words, Westfield Bank improperly and regularly charges its customers OD

Fees on transactions that were authorized into a positive available balance and multiple NSF fees on the same item.

106.    <u>Superiority</u>: It is impracticable to bring members of the Class's individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

107.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

108.    Westfield Bank has acted or refused to act on grounds generally applicable to the class, thereby making appropriate corresponding declaratory relief with respect to the Class as a whole.

109.    All conditions precedent to bringing this action have been satisfied and/or waived.

**<u>COUNT I - BREACH OF CONTRACT INCLUDING THE</u>**
**<u>COVENANT OF GOOD FAITH AND FAIR DEALING</u>**
**(Individually and on Behalf of the APPSN and Retry Classes)**

110.    Plaintiffs repeat and incorporate all of the preceding allegations as if fully set forth herein.

111.    Plaintiffs, and all members of the proposed Class contracted with Westfield Bank for checking account services, including debit card services.

112.    In its Account Documents, Defendant promised to only charge OD Fees on transactions that overdraw an account and to only charge a single fee per transaction.

113.    In breach of its Account Documents, Defendant charged OD Fees on transactions that were authorized on a positive balance and did not overdraw an account and charged multiple fees on a single transaction.

114.    Defendant's breach has caused Plaintiffs and the Class to incur additional OD Fees and NSF Fees that were never disclosed nor agreed to in the Account Documents.

115.    In addition, there exists an implied covenant of good faith and fair dealing in all contracts that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Good faith and fair dealing means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the spirit of their contract in addition to its substance.

116.    Failure to act in good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing include evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

117.    The implied covenant of good faith and fair dealing applies to the performance and enforcement of contracts and limits the parties' conduct when their contract defers decision on a particular term, omits terms, or provides ambiguous terms.

118.    Westfield Bank has breached the covenant of good faith and fair dealing and abused its discretion in its contract as described herein. Specifically, Westfield Bank should not have used its discretion to charge OD Fees on transactions that were authorized into a positive available balance and to charge multiple fees on a single transaction. The Account Documents do not have a contract term permitting it to charge OD Fees on transactions that were authorized into a positive available balance or multiple NSF fees on the same transaction, and the documents are otherwise

ambiguous as to any right for Westfield Bank to charge OD Fees on transactions that were authorized into a positive available balance or multiple fees on the same transaction.

119.   Plaintiffs and all members of the proposed Class have performed all, or substantially all, of the obligations imposed on them under the contract.

120.   Plaintiffs and all members of the proposed Class have sustained damages as a result of Westfield Bank's breach of the contract.

### COUNT II - VIOLATION OF MASSACHUSETTS CONSUMER PROTECTION ACT, G.L. c. 93A
### (Individually and on Behalf of the APPSN Class)

121.   Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

122.   This claim is asserted on behalf of Plaintiffs and the members of the Classes under Massachusetts Consumer Protection Act, G.L. c. 93A, et seq.

123.   The Massachusetts Consumer Protection Act declares unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce." G.L. c. 93A, § 2.

124.   Westfield Bank's acts and practices were in and affected trade or commerce as defined by G.L. c. 93A, §1.

125.   Westfield Bank engaged in unfair and deceptive acts and practices relating to the imposition of OD Fees, in violation of G.L. c. 93A, §§ 2 and 9. Specifically, Westfield Bank misrepresented its practice of charging OD Fees on transactions when those transactions did not overdraw accounts.

126.   Westfield Bank's acts and practices proximately caused injury to Plaintiffs and the Classes, and they are entitled to, inter alia, damages, injunctive, and declaratory relief.

127.   Westfield Bank's actions as detailed above were knowing or willful violations of

Mass. Gen. Laws c. 93A, §§ 2 and 9, entitling Plaintiffs and the Class members of the Classes to an award of double or treble damages.

128.    On June 27, 2022, before filing this Complaint, Plaintiff Levy sent a written demand for relief to Defendant. Defendant did not make a satisfactory response or reasonable offer of settlement.

129.    Because of the unfair and deceptive acts and practices of Westfield Bank, on behalf of themselves and the Classes, Plaintiffs seek actual damages, minimum statutory damages, double and treble damages, injunctive relief, and other such equitable relief as the Court finds necessary and proper, as well as reasonable attorneys' fees and costs under G.L. c. 93A, § 9(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, demand a jury trial on all claims so triable and judgment as follows:

A.    Certification for this matter to proceed as a class action on behalf of the Class;

B.    Declaring Westfield Bank's OD Fee and NSF Fee policies and practices to be in breach of its contract with accountholders;

C.    Order Defendant to immediately cease the wrongful conduct set forth above and enjoin Defendant from conducting business via the unlawful and unfair business acts and practices complained of herein;

D.    Restitution of all OD Fees and NSF Fees improperly paid to Westfield Bank by Plaintiffs and the members of the Class, as a result of the wrongs alleged herein in an amount to be determined at trial;

E.    Actual damages in an amount according to proof;

F.    Pre-judgment and post-judgment interest at the maximum rate permitted by

applicable law;

G.      For costs and attorneys' fees under the common fund doctrine, and all other

applicable law;

H.      Award double and treble damages against Defendant for its knowing or willful

violations of Massachusetts Consumer Protection Act, G.L. c. 93A §§ 2, 9; and

I.      Such other relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this

Class Action Complaint that are so triable.

Dated: January 5, 2023                         Respectfully submitted,

                                               */s/ Jonathan M. Hixon____*
                                               Jonathan M. Hixon, BBO # 692420
                                               Hackett Feinberg P.C.
                                               155 Federal Street, 9th Floor
                                               Boston, MA 02110
                                               Tel. (617) 422-0200
                                               jmh@bostonbusinesslaw.com

                                               Jeffrey D. Kaliel (PHV to be submitted)
                                               Sophia G. Gold  (PHV to be submitted)
                                               KALIELGOLD PLLC
                                               1100 15th Street NW, 4th Floor
                                               Washington, D.C. 20005
                                               Telephone: (202) 350-4783
                                               jkaliel@kalielpllc.com
                                               sgold@kalielgold.com

                                               David M. Berger (PHV to be submitted)
                                               Tayler L. Walters (PHV to be submitted)
                                               GIBBS LAW GROUP LLC
                                               1111 Broadway, Suite 2100
                                               Oakland, CA 94607
                                               Telephone: (510) 350-9700
                                               dmb@classlawgroup.com
                                               tlw@classlawgroup.com
                                               *Attorneys for Plaintiffs and the Putative Class*